**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **BRENNAN LANDY**, individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>**POWERHOME TECHNOLOGIES, LLC and JASJIT GOTRA,**<br><br>*Defendants.* | Case No. 1:23-cv-00241-WES-PAS<br><br>**MOTION FOR CLASS CERTIFICATION** |

## I. INTRODUCTION

Courts across the country have recognized that claims brought under the Telephone Consumer Protection Act ("TCPA") are well-suited for class certification. *See Bee, Denning, Inc. v. Capital Alliance Grp.*, 310 F.R.D. 614, 630 (S.D. Cal. 2015) ("In the context of the TCPA, the class action device likely is the optimal means of forcing corporations to internalize the social costs of their actions.") This case against Defendants Power Home Technologies LLC ("PHT") and PHT's owner and CEO, Jasjit Gotra ("Gotra") (collectively "Defendants") is no different.

Defendants contest liability and assert various defenses, including that it does not telemarket in the first place. The question of who's right is not yet before the Court. What matters at this stage is that common questions abound which can be resolved with a single stroke. As explained fully below, all requirements of Rule 23 are satisfied here and the Court should grant Plaintiff's Motion for Class Certification and certify the following Class:

> Plaintiff Landy and all other persons in the United States who, from four years prior to the filing of the instant action through the date notice is disseminated, (1)

received a telemarketing call made by PHT, Safe Home Safe, or any other of Gotra's entities or any of PHT's sub-dealers, vendors, lead generators, or agents either promoting PHT's goods or services or that could have resulted in the installation of a PHT product, good, or service; (2) on the person's telephone; (3) featuring an artificial or pre-recorded voice.

## II. FACTUAL BACKGROUND

This facts section is fairly extensive, but is required to set the stage for the Motion.

***The Unlawful Call Placed to Landy***

On September 9, 2020, Plaintiff Landy received a call from the phone number (610) 968-0687. (*See* Declaration of Brennan Landy, attached hereto as Exhibit A, ¶ 1.) The call was from an area code local to Plaintiff, so he answered the phone. (*Id.* ¶ 2.) Once he answered the call and said "hello", he heard a long pause after saying "hello" and had to say "hello" multiple times before anyone came on the line, and he heard a beep prior to the call connecting. (*Id.*) After saying "Hello" multiple times, he eventually heard a voice that was not a human voice—it was a computerized, artificial, or pre-recorded voice pretending to be someone named Carol from "Home Security Promotions", which solicited him to buy a home alarm system. (*Id.* ¶ 3.) "Carol" did not speak naturally like a normal person and misunderstood Landy's responses in a way that a human being would not. (*Id.*) It was plain to Landy, based on common sense and lived experience, that "Carol" was not a person and was instead an artificial, computerized voice. (*Id.*)

"Carol" then transferred Landy to an operator named Casey or Kaci, who was a live person who solicited Landy to purchase security products. (*Id.* ¶ 4.) Landy played along in an effort to know more about who placed this annoying and intrusive call, and he was transferred to someone with "Safe Home Safe", who scheduled a technician to visit his house. (*Id.*)

After this call was over, Landy received a subsequent follow up call from "Safe Home Safe" from the number 888-347-8873, in which the caller stated that someone named "Jacob"

would be visiting Landy's home. (*Id.* ¶ 5.) Later that day, Landy received a call from "Kenny" with PHT regarding the home security install pitched on the pre-recorded avatar call. (*Id.* ¶ 6.) Kenny stated that PHT would be the company installing the system should Landy proceed. (*Id.*)

Investigating the situation further, Landy called the 888-347-8873 number back and heard a pre-recorded message saying "thank you for calling Power Home Technologies". (*Id.* ¶ 6.) Landy also received an email follow-up from Mark Sterling of "Safe Home Safe" shortly after the initial call confirming the appointment. (*See* "Copy of Mark Sterling Email," attached as Exhibit 1 to Landy Declaration.)

A PHT representative arrived at Landy's house the day after the call, as he was told on the call would happen. (Landy Decl. ¶ 13.) That person gave Landy a Power Home Technologies yard sign, a photograph of which is attached as Exhibit 2 to Landy's Declaration.

***Defendants' Denials, Discovery Responses, and Testimony***

Since the beginning of the case, Defendants have denied any involvement in the telemarketing practices challenged by Landy. This includes:

- Denying that PHT ever engaged in any telemarketing whatsoever (*See* "Responses to Interrogatories", attached hereto as Exhibit B; "Gotra Deposition Transcript," excerpts of which are attached hereto as Exhibit C, at 56:6-22);
- Denying any relationship with or knowledge of Safe Home Safe (*See* Gotra Dep. Tr. 38:18-24; 39:1-10; Response to Interrogatory No. 8);
- Denying any relationship between PHT and a notorious telemarketer named Alliance Security, and between Alliance Holdings and Alliance Security (Gotra Dep. Tr. 27:1-24; 28:1-5); and

- Claiming that PHT only received customers via door-to-door sales and through builder business, never via any direct or indirect telemarketing. (Gotra Dep. Tr. 43:19-24; 44:1-4.)

Defendants have also claimed since the beginning of the case that PHT is long out of business, albeit on different dates. First, Defendants stated in their initial disclosures that PHT was dissolved in 2013. (*See* "Initial Disclosures," attached hereto as Exhibit D.) This never made sense to Plaintiff—a representative of PHT arrived at his home in September 2020, and PHT was filing periodic corporate reports at least into 2021 (*See* "2021 Periodic Report," attached hereto as Exhibit E.) Mr. Gotra admitted that this was an error in his deposition, and put the date that PHT went out of business as late 2020 or Quarter 1 2021. (Gotra Dep. Tr. 18:19-24; 19:1-8.) The Periodic Report attached as Ex. E is dated April 22, 2021 (*i.e.*, in Quarter 2 2021), evidencing that Gotra is still incorrect about when the entity went out of business.

Defendants have also claimed to have no business records as a result of the dissolution. (*See* Gotra Dep. Tr. 47:14-24; 48:1-24; 49:1-24; 50:1-24, 51:1-24; 52: 1-24; 53:1-24; 62:1-24; 63:1-24; 64:1-24). According to Gotra, all business records that may have been useful to Plaintiff in this case are lost; either via a Google Drive no one has access to, or paper documents that were abandoned in an office in North Carolina and are unretrievable. (*See id*.) Gotra also had trouble remembering the names of his employees who may have discoverable information. *(See Id*.)

***Facts Refuting Defendants' Denials***

Though discovery has been difficult in this case due to Defendants' outright denials and claims of lost documents and disappearing memory, Plaintiff has been able to piece together information refuting Defendants' denials. He addresses the topics in turn.

First, PHT and Gotra deny that PHT ever engaged in any telemarketing. Plaintiff already knows this is erroneous, because he received a telemarketing call that resulted in a PHT representative showing up at his house. In addition to that first-hand knowledge, Plaintiff was able to uncover LinkedIn and Facebook profiles from three (3) individuals who list themselves as former PHT employees whose jobs involved telemarketing. (*See* "Social Media Profiles," attached hereto as Exhibit F.) One such person, Brandy McMillian, lists herself as a PHT "Sales Consultant" beginning in January 2018 and states that one of her responsibilities was to "generate[] leads through telemarketing and in-person sales".

Next, Gotra and PHT deny having any relationship with or knowledge of Safe Home Safe. Gotra went so far as to say "Safe Home Safe, I don't understand what that is". (Gotra Dep. Tr. 38:18-24; 39:1-15.) This is curious, given the email Landy received from Mark Sterling of Safe Home Safe. The signature block of Mr. Sterling's email clearly lists an address for Safe Home Safe of 33 Broad Street, Floor 3, Providence, RI 02903. (*See* Ex. 1 to Landy Decl.). Mr. Gotra confirmed that PHT had the exact same address. (*See* Gotra Dep. Tr. 27:1-24.) So did, and as discussed more fully below, Alliance Security. (Gotra Dep. Tr. 25:1-5.) Furthermore, Mark Sterling's LinkedIn Profile states that he worked for Alliance Security (a Gotra entity), Smart Green Solar (a newer Gotra entity), and Safe Home Safe. (*See* "Sterling LinkedIn Profile," attached hereto as Exhibit G.)

Next, Gotra denied that there was any relationship between PHT and Alliance Security. In reality, a debtor complaint filed in Alliance Security's bankruptcy case sets forth the actual relationship. That complaint makes clear that Gotra owned 62% of Alliance Security and Alliance Holdings, which in turn owns PHT. (*See* "Bankruptcy Debtor Complaint," attached hereto as Exhibit H, at ¶¶ 2; 34-35.) The ownership of PHT dates back to 2014 and early-2015

(*See id*.) As the Debtor Complaint makes clear, "Alliance's shareholders operated PHT as an alter ego of [Alliance] insulated from the liabilities that dogged [Alliance] including claims asserted by the Federal Trade Commission". (*Id*. at ¶ 81.) Moreover, Alliance's own audited financial statements stated that "from time to time, the operating expenses of Power Home Technologies, LLC are paid by Alliance Security, Inc." (*Id.* at ¶ 83.) Ultimately, and far from having no relationship with each other, as Defendants claimed in discovery here, "PHT, Alliance Holdings, and Alliance were operated as a single economic entity without regard for their purportedly separate existence. The formation of Alliance Holdings, and its acquisition of PHT, were carried out to perpetrate a fraud and injustice on the creditors of Alliance". (*Id*. at ¶ 86.) Around the same time as the acquisition by Gotra and Alliance Holdings of PHT, at least one state attorney general pursued an enforcement action against PHT for telemarketing violations. (See "Washington Examiner Article," attached hereto as Exhibit I.)

Indeed, Gotra was in trouble with the FTC for robocalls at the relevant time period to the calls at issue in this case. That is, less than four (4) months before Landy was called, Gotra stipulated to a permanent injunction that involved a civil penalty of $9,845,021. (*See* "Permanent Injunction," attached hereto as Exhibit J.) Part of that injunction involved recordkeeping and required Gotra to retain accounting records, personnel records, records of consumer complaints, and records related to telemarketing for <u>any</u> business that he owns, which makes his denials of possessing any relevant documents in this case even more curious. (*See Id*. at 11.)

Finally, PHT and Gotra both contend that PHT is long out of business, at the latest by early 2021. This is again curious, since PHT entered into a settlement agreement and consent judgment in March 2022, agreeing to a judgment of more than $5 million in the bankruptcy debtor complaint. (*See* "Settlement and Mutual Release Agreement," attached hereto as Exhibit

K.) Gotra signed on behalf of PHT and listed himself as CEO on that document, in March 2022. (*See id.*)

It should be noted that Landy originally filed his case in the Eastern District of North Carolina on August 23, 2021, with PHT (via Gotra) being served in September 2021. (*See* "North Carolina Proof of Service," attached hereto as Exhibit L.) That filing triggered the obligation to preserve evidence relevant to the claims, which PHT and Gotra say that they have failed to do. *See, e.g., Gordon v. Dreamworks Animation SKG, Inc.*, 935 F. Supp. 2d 306, 314 (D. Mass. 2013) (the duty to preserve evidence arises when litigation is reasonably anticipated). Defendants will now likely use its own lack of recordkeeping, hiding-the-ball, and outright mendaciousness to claim that Plaintiff's motion for class certification should be denied. As explained below, the Court should not permit such tactics to win the day.

## III. ARGUMENT

Class certification is appropriate where the class is ascertainable and where the record shows that all of the enumerated requirements of Rule 23(a) and at least one section of Rule 23(b)(3) are satisfied. Fed. R. Civ. P. 23; *see also Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 613-14, 117 S.Ct. 2231 (1997). As explained below, that is precisely the case here, and the Court should grant Plaintiff's motion to certify the Class.

### A. The Class Meets Each Of The Requirements Of Rule 23(a).

Rule 23(a) requires that (i) the proposed class is so numerous that joinder of all individual class members is impracticable (numerosity); (ii) that there are common questions of law and fact among the class members (commonality); (iii) that the proposed representative's claims are typical of those of the class (typicality); and (iv) that both the named representative and his or

her counsel have and will continue to adequately represent the interests of the class (adequacy). Fed. R. Civ. P. 23(a).

Plaintiffs here seek certification under both Rule 23(b)(2) and 23(b)(3). Under Rule 23(b)(2), which concerns injunctive and declaratory relief, a plaintiff must show that the party opposing certification has acted or failed to act on grounds generally applicable to the class as a whole, "so that final injunctive relief or corresponding declaratory relief is appropriate…." Fed. R. Civ. P. 23(b)(2). On the other hand, certification under Rule 23(b)(3), which generally includes class claims for damages, requires that there be questions of law or fact common to the proposed class members that predominate over any questions affecting only individual members, and that the class mechanism must be superior to other available methods for fairly adjudicating the controversy. Fed. R. Civ. P. 23(b)(3).

As explained further below, the proposed Class in this case meets all of the requirements of Rules 23(a), (b)(2), and (b)(3), and should therefore be certified.

**1. Class membership is ascertainable—Class members can be identified through reference to objective criteria, including Class member declarations and phone records.**

Although Rule 23 doesn't expressly require that a proposed class be ascertainable, courts continue to impose such a condition. *See Lukovsky v. City & Cty. of San Francisco*, No. C 05-00389 WHA, 2006 WL 140574, at *2 (N.D. Cal. Jan. 17, 2006); *but see Cherry v. Dometic Corp.*, 986 F.3d 1296, 1304 (11th Cir. 2021) ("administrative feasibility is not a requirement for certification under Rule 23 . . . we limit ascertainability to its traditional scope: a proposed class is ascertainable if it is adequately defined such that its membership is capable of determination."); *see also Rhodes v. Cracker Barrel Old Country Store, Inc.*, 213 F.R.D. 619,

674 (N.D. Ga. 2003) ("The class simply must meet a minimum standard of definiteness which will allow the trial court to determine membership in the proposed class.") (quotations omitted.)

A class definition is sufficient if it is "definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member." *Gardner v. Shell Oil Co.*, C-09-5876-CW, 2011 WL 1522377, at *3 (N.D. Cal. Apr. 21, 2011) (citation omitted); *see also* 5 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE, ¶ 23.21[1] (3d ed. 2001) ("The identity of class members must be ascertainable by reference to objective criteria.").

However, "a court need not ascertain 'absent class members' actual identities ... before a class can be certified... rather, it is enough that the class be ascertain*able*'... with class members to be identified during a claims administration process if the class prevails.'" *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 245 (N.D. Ill. 2014) (quoting *Boundas v. Abercrombie & Fitch Stores, Inc.*, 280 F.R.D. 408, 417 (N.D. Ill. 2012)). If the court "can ascertain the members of the class by reference to objective criteria, then the class is adequately defined." *Edwards v. Zenimax Media Inc.,*, 2012 WL 4378219, at *4 (D. Colo. Sept. 25, 2012).

Applied here, Class membership is based on objective criteria. Whether someone is in the United States and receive a phone call during the relevant time period which featured an artificial or pre-recorded voice for the purpose of selling one of PHT's products or services are all wholly objective inquiries. To the extent there remains any doubt, Class Members can provide records, including affidavits and documents including phone bills, to establish class membership. Again, "'It is enough that the class be ascertainable' with class members to be identified during a claims administration process if the class prevails." *Birchmeier*, 302 F.R.D. at 245 (citing *Boundas v. Abercrombie & Fitch Stores, Inc.*, 280 F.R.D. 408, 417 (N.D. Ill. 2012) ("a court need not ascertain "absent class members' actual identities ... before a class can be certified.")

Documentary evidence, together with sworn declarations from class members, can be used to show class membership. *Birchmeier*, 302 F.R.D. 240, 249–50 (N.D. Ill. 2014); *Abboud v. Agentra, LLC*, 2020 U.S. Dist. LEXIS 168142, at *9 (N.D. Tex. Sept. 14, 2020) ("Members who qualify for either the text class or the agent class will be ascertainable due to proof they will be required to present to establish their position in the class. . . potential class members could present phone bills . . . a picture of the text message, a record from a cell phone bill, or some other objective proof. Therefore, the class appears objectively ascertainable.")

Though Defendants are likely to argue that the class cannot be ascertained given (as discussed in the Factual Background section above) its failure to preserve any corporate records, "[t]his argument must fail on its face; a TCPA defendant's failure to maintain adequate records is not a legitimate basis for denying certification." *Thrower v. Citizens Disability, LLC* 2022 U.S. Dist. LEXIS 155803, at *6 (D. Mass. Aug. 30, 2022) (citing *Birchmeier* 302 F.R.D. at 250 (declining to deny certification based on insufficiency of defendants' records because "defendants are essentially arguing that the contours of the class should be defined by defendants' own recordkeeping").) As the *Thrower* Court further explained, "declining to certify a class altogether, as defendants propose . . . would create an incentive for a person to violate the TCPA on a mass scale and keep no records of its activity, knowing that it could avoid legal responsibility for the full scope of its illegal conduct." *Id*.

This is precisely the case here. Defendants claim that they failed to preserve any business records, but such a failure cannot defeat class certification without incentivizing unlawful conduct. The Court should certify the Class and Order that notice to the Class be conducted by publication. *See Plante v. Storybuilt, LLC*, 2025 U.S. Dist. LEXIS 2892, at *19 (W.D. Tex. Jan. 7, 2025) ("given that Plaintiffs have been unable to secure discovery from StoryBuilt—which

may impede their ability to obtain up-to-date contact information for proposed class members—the undersigned finds that notice by publication is also warranted here.”); *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 296 (W.D. Tex. 2007) (finding notice by publication adequate where case involved "potential class members who could not be identified"); *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 786 (7th Cir. 2004) (“When individual notice is infeasible, notice by publication in a newspaper of national circulation ... is an acceptable substitute.”); *Shurland v. Bacci Café & Pizzeria on Ogden, Inc.*, 271 F.R.D. 139, 145 (N.D. Ill. 2010) ("In instances where the names and addresses of class members are not easily ascertainable, notice by publication alone continues to find support in more recent case law."); *Thomas v. NCO Fin. Sys*., 2004 U.S. Dist. LEXIS 5405, at *10 (E.D. Pa. Mar. 31, 2004) (“If the members of a putative class may not be determined by reasonable means, then constructive notice by publication may satisfy the requirements of Rule 23(c)(2).” *See also Reppert v. Marvin Lumber & Cedar CO.*, 359 F.3d 53, 57 (1st Cir. 2004) (recognizing newspaper notices met requirements of due process).

Once notice is made by publication, the Court can follow the process outlined in *Abboud v. Agentra,* where again the Court held:

> The Court finds that the two proposed classes—the agent class and the text class—appear ascertainable and that the four threshold requirements appear to be met for both classes. Members who qualify for either the text class or the agent class will be ascertainable due to proof they will be required to present to establish their position in the class. Agentra claims that ascertaining the agent class is subjective, not objective. But potential class members could present phone bills, or other forms of proof, showing that phone numbers used by Agentra called their phone. If the potential class members then signed affidavits saying they had never given Agentra permission to solicit them, and Agentra could not offer proof to the contrary, it would objectively give rise to the likelihood that the potential class members did not consent to the call. Similarly, the text class could provide documentation in the form of a picture of the text message, a record from a cell phone bill, or some other objective proof. Therefore, the class appears objectively ascertainable.

*Agentra*, 2020 U.S. Dist. LEXIS 168142, at *9. Applied here, and as suggested by *Birchmeier*, the process could work like a claims process, where a claims administrator is retained and persons who meet the definition of the Class can submit documentation and/or affidavits evidencing their Class membership by a deadline established by the Court.

In short, class membership is objectively ascertainable and the Class should be certified.

**2. Numerosity is met here.**

Numerosity is met where "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). There is not a specific number of class members needed to establish numerosity; however, courts generally find the numerosity requirement to be satisfied when the class size exceeds forty members. *Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.*, 311 F.R.D. 590, 602-603 (C.D. Cal. 2015) ("As a general matter, courts have found that numerosity is satisfied when class size exceeds 40 members.") (citation omitted). A proponent of certification need not identify the exact number of class members to satisfy numerosity; Precision isn't required, nor is hard data. *See, e.g.*, *Neiberger v. Hawkins*, 208 F.R.D. 301, 313 (D. Colo. 2002); *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993).

The Court is entitled to make common sense assumptions to find support for numerosity. *See Thrower* 2022 U.S. Dist. LEXIS 155803, at *7-8 ("the numerosity inquiry should be guided by 'common sense,' particularly when concrete evidence is lacking. . . Here, given the nature of the nationwide marketing strategy alleged, common sense suggests that there may be thousands of class members.") (citation omitted); *In re One Bancorp Sec. Litig.*, 136 F.R.D. 526, 529 (D. Me. 1991) ("the Court may "make 'common sense assumptions' in order to support a finding of numerosity."); *Zeidman v. Ray McDermott & Co.*, 651 F.2d 1030, 1038-39 (5th Cir. 1981) (noting that common-sense assumptions can support a finding of numerosity); *Orantes-*

*Hernandez v. Smith*, 541 F. Supp. 351, 370 (C.D. Cal. 1982) ("Where the exact size of the class is unknown but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied.")

Applied here, the exact number of Class members at issue is unknown at this time given the complete lack of recordkeeping on the part of the Defendants, but Landy alleged that "thousands of consumers" received the pre-recorded calls at issue. (Compl. ¶ 31.) This alone is sufficient. *See Agentra*, 2020 U.S. Dist. LEXIS 168142, at *10) ("Turning to the numerosity requirement, Abboud alleges that there are thousands of class members, making joinder of all the parties impossible. This satisfies [] the numerosity requirement"). Moreover, Alliance Security (as discussed above, the predecessor and alter ego entity of PHT and Gotra) was found by the FTC to have placed over half-a-million illegal calls. (*See* "Motion for Injunction," attached hereto as Exhibit M, at 9) ("The evidence described below establishes more than 500,000 illegal calls by Alliance, and more than 1 million additional illegal calls by two of Alliance's third-party telemarketers"). Common sense indicates that there are at least 40 members of this Class. The exact numbers can be determined via a self-identification process after notice is disseminated. For now, it is enough that numerosity is satisfied.

**3. The Class shares common questions of law and fact.**

Rule 23(a) next requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To meet the commonality prong, the representative plaintiff must demonstrate that the proposed class members "have suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). But the claims don't need to be identical. Rather, even a single common question will do. *See id.* at 2556 (citation omitted).

"Commonality is a low hurdle". *Thrower* 2022 U.S. Dist. LEXIS 155803, at *8. Indeed, under commonality's "permissive" standard, "'factual differences in the claims of the class members should not result in a denial of class certification where common questions of law exist.'" *Joseph v. Gen. Motors Corp*., 109 F.R.D. 635, 640 (D. Colo. 1986) (quoting *Milonas v. Williams*, 691 F.2d 931, 938 (10th Cir. 1982), cert. denied, 460 U.S. 1069 (1983)); *Parra v. Bashas', Inc*., 536 F.3d 975, 978 (9th Cir. 2008) ("[w]here the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class, commonality exists.") Commonality requires that only a single issue be common to the class. *In re First Alliance Mortg. Co.*, 471 F.3d 977, 990-91 (9th Cir. 2006) ("Rule 23(a)(2) commonality may be met by a single issue of law or fact.". As the Supreme Court explained in *Dukes*, "[w]hat matters to class certification. . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. *Dukes*, 131 S. Ct. at 2551 (citing Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 131-132 (2009)).

Plaintiffs and the Class share multiple common issues of law and fact, including whether: (1) Gotra can be held personally liable for the calls; (2) any consent defense raised by Defendants; (3) whether the calls were pre-recorded; and (4) whether the violations were willful such that the Court should award treble damages. And because the Class is defined narrowly and will only include persons who can provide some documentation evidencing Class membership, the litigation will provide answers for everyone. In short, the case will produce common questions of law and fact for all class members.

**4. Plaintiff's claims are typical.**

The typicality prerequisite of Rule 23(a) is fulfilled if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "[T]he typicality requirement looks to whether the claims of the class representatives [are] typical of those of the class, and [is] satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (citation omitted). The test is whether the class has the same or similar injury and whether the action is based on conduct that is not unique to the named plaintiffs. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). "A finding of commonality will ordinarily support a finding of typicality." *Barefield v. Chevron U.S.A., Inc.*, 1987 WL 65054, at *5 (N.D. Cal. Sept. 9, 1987).

"Typicality and commonality 'tend to merge' because they both focus on whether the plaintiffs' claims are sufficiently 'interrelated' with those of the class. *Thrower* 2022 U.S. Dist. LEXIS 155803, at *8 (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)); *In re Bos. Sci. Corp. Sec. Litig.*, 604 F. Supp. 2d 275, 282 (D. Mass. 2009) ("The plaintiff can [establish typicality] by showing that its injuries arise from the same events or course of conduct as do the injuries of the class, and that its claims are based on the same legal theory as those of the class.").

Here, Plaintiffs' claims are typical of those of the other class members. They received the same calls that everyone else received, and the Defendants and their agents acted the same way as to all Class members. *Thrower* 2022 U.S. Dist. LEXIS 155803, at *8 ("The plaintiffs have met their burden as to both commonality and typicality by alleging that they received the same types of calls as other class members, and that they were unlawfully harmed in the same way."). *See also Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996) ("Typicality under Rule

23(a)(3) should be determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members.").

Defendant subjected Plaintiff and the Class to a uniform course of conduct. As such, if Plaintiff proves that the calls were unlawful, then Defendants violated the TCPA with respect to everyone. Additionally, if Plaintiff proves that Mr. Gotra can be held liable, then he can be held liable with respect to every Class Member's claim as well. Because Plaintiff's claims arise out of the same course of conduct as the class members' claims, typicality is satisfied.

**5. Plaintiff and Proposed Class Counsel are adequate representatives.**

Finally, Rule 23(a) requires that the representative parties have and will continue to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent.'" *Amchem Products, Inc*., 117 S.Ct. at 2250-2251. "Two questions are considered when determining the adequacy of representation: '(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Pina v. Con-Way Freight, Inc.*, No. C 10-00100 JW, 2012 WL 1278301, at *5 (N.D. Cal. Apr. 12, 2012).

Plaintiff and his counsel have and will continue to fairly represent the Class, and neither has any conflict with the class members. Plaintiff has stepped forward, put his name out, and done everything required of him as named plaintiff, and his counsel has spent time and resources investigating and prosecuting this action. Further, proposed Class Counsel has experience litigating class actions of similar size, scope, and complexity.

In the end, "only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status." *Joseph v. Gen. Motors Corp.*, 109 F.R.D. 635, 640 (D.

Colo. 1986) (quoting 7 C. Wright & A. Miller, *Federal Practice and Procedure* § 1768 at 638–39). "[T]he adequacy requirement mandates that no conflicts of interest exist between the named plaintiffs and the absent class members," *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M 02-1486, 2006 WL 1530166, at *6 (N.D. Cal. June 5, 2006), and adequacy is only defeated by actual conflicts. *Soc. Servs. Union, Local 535 v. Cnty. of Santa Clara*, 609 F.2d 944, 948 (9th Cir. 1979). Here there are no actual conflicts and Rule 23(a)(4) is satisfied.

**B. The Proposed Class Meets The Requirements Of Rule 23(b)(2).**

Once Rule 23(a) is satisfied, the inquiry turns to Rule 23(b). In this case, Plaintiff seek certification under both Rule 23(b)(2) and (b)(3). Rule 23(b)(2) provides that the party opposing certification must have acted or failed to act on grounds generally applicable to the proposed class, "thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2). "[T]he key to the (b)(2) class is the 'indivisible nature of the injunctive or declaratory remedy warranted.'" *Dukes*, 131 S. Ct. 2451 at 2557. "[W]hile Rule 23(b)(2) class action have no predominance or superiority requirements, it is well established that the class claims must be cohesive.'" *Barraza v. C.R. Bard, Inc. and Bard Peripheral Vascular, Inc.*, 322 F.R.D. 369, 387 (D. Ariz. 2017) (citing *Barnes v. American Tobacco Co.*, 161 F.3d 127, 143 (3rd Cir. 1998)).

In this case, Defendants subjected Plaintiff and the Class to a uniform course of conduct and nothing about their conduct varied in any significant manner with respect to members of the Class. As such, the requirements of Rule 23(b)(2) are satisfied to support certification.

**C. The Proposed Class Meets The Requirements Of Rule 23(b)(3).**

Certification is also warranted under Rule 23(b)(3), which provides that a class action may be maintained where the questions of law and fact common to members of the class predominate over any questions affecting only individual members, and the class action mechanism is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3).

**1. Common questions of law and fact predominate.**

"Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy." *Valentino v. Carter-Wallace, Inc.* 97 F.3d 1227, 1234 (9th Cir. 1996). "The predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1045 (2016). "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3).'" *Id.* (citation omitted).

Predominance requires that a "sufficient constellation of common issues binds class members together . . . ." *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000); *see also Donovan*, 268 F.R.D. at 28 ("The heart of the predominance inquiry is whether the 'uncommon questions' outweigh the commonalities." (citation omitted)). The point of the predominance inquiry is to "test whether any dissimilarity among the claims of class members can be dealt with in a manner that is not 'inefficient or unfair.' *In re Asacol Antitrust Litig.*, 907 F.3d 42, 51 (1st Cir. 2018).

Here, again, Plaintiff and the Class were subjected to an identical course of conduct. If Defendants violated the TCPA with respect to Plaintiff, then they violated the TCPA with respect every class member. There are no individualized issues to preclude certification. As such,

the Court should find that common issues predominate over any hypothetical individualized issues.

**2. A class action is superior to any other method of adjudication.**

As a final matter with respect to certification, Rule 23(b)(3) requires that the class action mechanism be manageable and superior to other available methods for adjudicating the controversy. Fed. R. Civ. P 23(b)(3). "[T]he purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (citing 7AA Charles Wright, Arthur Miller & Mary Kay Kane, Federal Practice and Procedure, § 1779 at 174 (3d ed.2005)). Rule 23(b)(3) includes the following non-exhaustive list of factors pertinent to this inquiry:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and; (D) the likely difficulties in managing a class action.

Additionally, "[w]here damages suffered by each class member are not large, this fact weighs in favor of certifying a class action." *Smith v. Microsoft Corp.*, 297 F.R.D. 464, 468 (S.D. Cal. 2014) (citing *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180 (9th Cir. 2001).

Tellingly, courts routinely certify class actions involving violations of the TCPA. *See, e.g., Bauman v. Saxe*, No. 14-CV-01125-RFB-PAL, 2019 WL 157923, at *7 (D. Nev. Jan. 10, 2019) (granting motion to certify TCPA class); *Fisher v. MJ Christensen Jewelers, LLC*, No. 15-CV-00358-RFB-NJK, 2018 WL 1175215, at *7 (D. Nev. Mar. 6, 2018) (same); *Bellows v. NCO Fin. Sys., Inc.*, 2008 WL 4155361, at *8 (S.D. Cal. Sept. 5, 2008) (holding in a TCPA action that "[t]he class action procedure is the superior mechanism for dispute resolution in this

matter. The alternative ... would be costly and duplicative."); *Thrower v. Citizens Disability, LLC* 2022 U.S. Dist. LEXIS 155803 (D. Mass. Aug. 30, 2022) (certifying TCPA Class); *Abboud v. Agentra, LLC*, 2020 U.S. Dist. LEXIS 168142 (N.D. Tex. Sept. 14, 2020) (same).

This case presents the classic case for class treatment. That is, Plaintiffs are seeking statutory damages for each violation of the TCPA, which amounts to $500 per violation, or $1500 if trebled. Given the small amount of damages likely to be recovered on an individual basis, pursuing separate, individual suits would be prohibitively expensive for all members of the Class. Moreover, when considering the cohesive nature of the class members' claims, individualized trials would require duplicative proceedings and could produce inconsistent rulings. In the end, individualized trials would result in a waste of judicial time and resources.

Thus, the Court should find that the superiority requirement is satisfied here.

## IV. CONCLUSION

The proposed Class is worthy of certification here. As such, this Court should grant class certification, appoint Landy as the Class Representative and his Counsel as Class Counsel, and award such additional relief as the Court deems necessary, reasonable, and just.

* * * * *

Respectfully Submitted,

**BRENNAN LANDY**, individually and on behalf of all of similarly-situated individuals,

Dated: May 7, 2025

By: /s/ Patrick H. Peluso
One of Plaintiff's Attorneys

Patrick H. Peluso*
ppeluso@pelusolawfirm.com
Peluso Law, LLC
865 Albion St., Suite 250

Denver, Colorado 80220
Tel: (720) 805-2008

Albin Moser, Esq.

Law Offices of Albin Moser, P.C.
166 Valley Street
Building 6M, Suite 103
Providence, RI 02909
(401) 861-2100
albin@albinmoser.com

* pro hac vice

## CERTIFICATE OF SERVICE

I am a resident of the State of Colorado, over the age of eighteen years old, and am not a party to this lawsuit. My business address is 865 Albion St, Suite 250, Denver, Colorado 80220. I HEREBY CERTIFY that on the 7th day of May 2025, I filed the foregoing **MOTION FOR CLASS CERTIFICATION** electronically through the CM/ECF system, which caused all parties and counsel of record to be served by electronic means.

I declare that the foregoing is true and correct.

/s/ Patrick H. Peluso